**J.H. WESTERBEKE CORPORATION, Plaintiff,**

v.

**ONAN CORPORATION, Defendant.**

**Civ. A. No. 81–0260–MA.**

United States District Court, D. Massachusetts.

Feb. 14, 1984.

Robert Glass and Mary Long, Deutsch, Glass & Brooks, Boston, Mass., for plaintiff.

Edwin J. Carr and Michael J. McHugh, Rich, May, Bilodeau & Flaherty, Boston, Mass., for defendant.

## OPINION

MAZZONE, District Judge.

### STATEMENT OF THE CASE

This is an action under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under various state law claims, for the wrongful refusal to renew a distributorship. The plaintiff, J.H. Westerbeke Corporation (Westerbeke), is a Massachusetts corporation in the business of selling and servicing propulsion engines and diesel-powered electric generating sets (gensets) for marine applications. The defendant, Onan Corporation (Onan), is a Minnesota corporation in the business of manufacturing and selling gasoline-driven and diesel-powered electric generators for a full range of applications, including marine. Onan sells its products directly or through its system of distributors located throughout the United States. Until December 31, 1980 Westerbeke had a distributorship agreement with Onan.

This action arises out of Onan's decision not to renew the distributorship agreement with Westerbeke when it expired on December 31, 1980. Westerbeke raises three

claims: (1) that Onan's actions constituted monopolization or an attempt to monopolize in violation of Section 2 of the Sherman Act; (2) that Onan's actions breached a contract wherein Onan had agreed to renew the distributorship agreement; and (3) that Onan's actions constituted unfair business practices in violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A.[1] Onan charges by way of counterclaim that Westerbeke owes Onan $204,021.75 for goods sold and delivered, plus late payment and interest charges. This Court has jurisdiction pursuant to 15 U.S.C. § 2 and 28 U.S.C. §§ 1337(a) and 1332(a).

Briefly stated, Westerbeke's theory of its antitrust claim is that Onan was a monopolist and misused its monopoly power when it did not renew the distributorship agreement because, in so doing, Onan intended to eliminate Westerbeke as a competitor in the sale of marine diesel gensets in the 0 to 30 kilowatt range, the market in which Onan is alleged to have monopoly power. Westerbeke claims that Onan's alleged business justifications for its decision not to renew Westerbeke's distributorship were mere pretexts trumped up by Onan. Westerbeke says Onan set unrealistic and unattainable sales goals for Westerbeke, and unfairly criticized Westerbeke's performance despite steady improvement in its sales of Onan's products, in order to build a case for non-renewal of its distributorship. Westerbeke says its performance, as compared to other Onan distributors, did not justify non-renewal.

Onan disputes each and every essential element of Westerbeke's claim. It denies that its decision not to renew the distributorship agreement had any anti-competitive motive. Rather, it states that it had reason to believe that Westerbeke was not representing effectively Onan products in the New England territory. Onan was concerned with Westerbeke's failure to maintain an adequate sales staff, adequate inventory, and adequate financing. It was also concerned with Westerbeke's failure to make prompt payment for Onan products. In addition, Onan asserts that the relevant product market for purposes of antitrust analysis consists of both diesel and gasoline gensets of all applications up to 1000 or 2000 kilowatts. Onan denies that it has monopoly power in this market.

In its contract claim, Westerbeke asserts that an October 8, 1979 letter to Westerbeke from Edward Hafner of Onan (Hafner letter) constituted an offer to renew the distributorship agreement provided that Westerbeke met certain requirements. Westerbeke contends that it met those requirements and, therefore, Onan's promise to renew is enforceable. Onan denies that it ever made an offer to renew and, further, states that Westerbeke failed to meet the requirements specified in the Hafner letter.

Lastly, Westerbeke sues under M.G.L. c. 93A, claiming that Onan's conduct constituted unfair business practices. Onan denies that its actions were motivated by anything other than legitimate business concerns.

■ Onan's counterclaim is a straightforward claim for goods sold and delivered, together with late payment and interest charges. Westerbeke does not dispute the amount owed, but does challenge the late payment and interest charges.[2]

---

1. Westerbeke's original complaint also charged: violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; violation of Section 3 of the Clayton Act, 15 U.S.C. § 14; price-discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13(a); breach of contract and warranty for the sale of goods; interference with advantageous contractual relations; and declaratory relief. All of these counts were withdrawn, leaving only the issues of monopolization or attempted monopolization, breach of contract and c. 93A unfair business practice to be decided.

2. In its amended counterclaim, Onan charged that the refusal of Westerbeke to pay for goods sold and delivered, and related actions, constituted an unfair business practice in violation of c. 93A. At the close of the evidence, I granted the motion of the defendant-in-counterclaim to dismiss the count pursuant to Fed.R.Civ.P. 41(b). While Westerbeke's tactics and reasons for not paying Onan certainly were questionable and not to be encouraged, I could not say, as the trier of fact, that they rose to the level of unethi-

The case was tried to the Court without jury. The record consists of trial testimony over 9 days, numerous exhibits, extensive deposition testimony and affidavits. Pursuant to Fed.R.Civ.P. 52(a), I make the following findings and conclusions.

## BACKGROUND OF THE CASE

Because of the voluminous record and the importance of the Court's factual findings to the legal claims at issue, and because the testimony was in sharp conflict on various critical points, a more extensive recitation of the factual background is required.

Westerbeke was founded in 1937 as a distributor of Gray Marine engines in commercial marine applications. With the end of World War II, the distributorship was broadened to encompass both commercial and recreational marine applications. In 1949, Westerbeke also became a distributor of the full line of Onan products, including industrial engines and electric generating equipment. In the early 1960's Westerbeke commenced the transition from being solely a distributor of other manufacturers' products to an assembler of marine propulsion engines and generators marketed under the Westerbeke name for use on small pleasure boats, such as sailboats and small power boats. Until at least 1977 or 1978, Westerbeke imported engine blocks and heads from major manufacturers such as Perkins and British Leyland into the United States for assembly and modification to adapt them to marine use. A genset is simply an assembly of an engine with a generator that produces electrical power for the various needs, and is considered either gas or diesel powered, depending on the propulsion fuel of the engine. Westerbeke refers to the process of adapting products to marine use as "marinization."

During this same period of time, Westerbeke established a network of representatives and dealers to market its assembled product. Westerbeke sold its marine propulsion engines and diesel gensets to boatbuilders, yacht repair yards, commercial marine markets, the United States Government and individual boat owners. Its gensets were also sold for non-marine applications where auxiliary power was required, such as for municipal buildings, apartments, schools and on-site construction. Westerbeke itself has never manufactured any engines or generators.

Onan is a manufacturer of engines and generators. It provides a complete product range, from small portable 1 kilowatt gensets to 4 megawatt turbine-powered units designed for cogeneration and total energy systems installations. Its products are designed for industrial, institutional and recreational uses. In addition to manufacturing engines and generators, Onan manufacturers integrated controls, transfer switchgear and other products in order to provide power for a variety of applications. Onan entered the marine genset application around 1960 and soon dominated sales with its broad line of gasoline and diesel gensets. The diesel "J" series engine, developed specifically for marine use, accounted for much of Onan's success. The "J" series was supported by Onan's reputation and its established distribution network capable of providing parts and service throughout the country. The high quality "J" series line of marine gensets remained relatively unchallenged for almost twenty years and so, also remained unchanged throughout these years. In the late 1970's, the "J" series line of marine gensets became vulnerable to competitive technological innovations in diesel genset development. In particular, Westerbeke introduced its new, improved line of lighter, smaller and quieter diesel gensets.

Throughout the 1960's and 1970's, Westerbeke had invested in a number of its own projects. Westerbeke experimented with completely assembled gensets, a fresh/sea water product, a diesel boat heater, etc. Westerbeke also attempted to design and develop a 4 cylinder, 70 cubic inch, fresh water cooled, diesel engine called the "Star" engine. These projects required

cal behavior required by the statute. *See Nei v.* *Burley,* 388 Mass. 307, 446 N.E.2d 674 (1983).

substantial investment. However, they were all unsuccessful or unfruitful, and were eventually dropped by Westerbeke.

From time to time, Westerbeke and Onan had entered into renewable, written distributorship agreements. The last distributorship agreement, which is the subject of this litigation, was executed in May of 1977 and expired of its own terms on December 31, 1980.

In 1978 and 1979, Onan began to feel that Westerbeke was not representing adequately Onan's products in its assigned territory of New England. Onan felt that Westerbeke's market penetration was unsuccessful and sales objectives were not met for several reasons: Westerbeke's personnel assigned to the Onan line were not doing their best to market Onan products; Westerbeke did not have a total dealer program for sales; Westerbeke's inventory of Onan products was insufficient; and, in general, Westerbeke made an insufficient capital commitment to increase inventories and invest in the dealer program and rental fleet. Onan was not convinced that Westerbeke was returning the revenues generated by the Onan line to the Onan division, since specific financial information on the Onan division was not regularly provided and there was no clear "divisionalization" of the Onan business.

In addition, Onan received complaints directly from major, non-marine customers who felt their accounts were not serviced adequately by Westerbeke. In particular, Wolf Coach, a manufacturer of custom coaches who was purchasing 60 to 70 Onan generators from the 5 to 7.5 kilowatt range, refused to deal further with Westerbeke. Wolf Coach asserted that Westerbeke did not stock units and, in fact, units ordered for Wolf Coach had been sold to other customers. Wolf Coach complained about never seeing a Westerbeke salesman, not getting its calls returned when it had problems, and encountering long waits for parts. John Frederick of Onan called on Wolf Coach three times with Westerbeke personnel in an effort to stabilize the account for Westerbeke, but was informed by the President of Wolf Coach that it would switch to Kohler generators if it was forced to deal with Westerbeke. The only sales calls to Wolf Coach by Westerbeke personnel from June to December of 1979 were ones initiated and attended by Frederick of Onan. Eventually, in February of 1980, Frederick had to authorize another Onan distributor to service the Wolf Coach account.

Similarly, National Medical Care, who was purchasing over $200,000 of Onan generators for standby use in hospitals, complained about poor communication from Westerbeke. Although Westerbeke agreed to call on National Medical Care every 10 days to handle problems, its Chief Engineer claimed that he saw a Westerbeke salesman only every 1½ to 2 months. National Medical Care also had trouble getting its calls returned. The Chief Engineer informed Frederick that he was unhappy with the service received from Westerbeke and inquired about direct service by Onan or by distributors at local job sites.

Doering Equipment Company, a large manufacturer of utility bodies for trucks who was using 30 to 35 Onan generators for its customer, the Boston Gas Company, also refused to do business with Westerbeke. Doering cited poor service, unreturned telephone calls and, eventually, the wishes of its customer, Boston Gas. Boston Gas originally had specified to Doering that it use Onan generators, but Boston Gas eventually refused to do business with Westerbeke because of similar poor service, unreturned telephone calls, and difficulty in getting parts on a timely basis. By March of 1980, Boston Gas was prepared to switch to another generator manufacturer unless a different distributor was found to service its account. Despite the unwillingness of Doering and Boston Gas to continue with Westerbeke, Onan attempted to iron out differences between Boston Gas and Westerbeke in order to save the account for Westerbeke.

Problems in the Westerbeke distributorship had been noted not only by Westerbeke customer accounts, but also by West-

erbeke's bank. On March 6, 1979, the bank noted that the Onan department had lost $43,000 on sales of $287,000. The bank's new marketing director had found that the Onan department was "out of control:" "It was ordering wrong, had the wrong items in stock and had to buy outside, at a loss or minimal profit, to fill customers' orders." The bank officer noted that Westerbeke did not anticipate being able to do better than break even in the Onan department by the end of 1978.

Westerbeke failed to respond to Onan's repeated requests throughout the fall of 1979 and early 1980 for a written, defined dealer program for Class A (smaller products) sales. Westerbeke fired its dealer coordinator in December of 1979, and did not hire a Class A salesman, claiming that not enough profit was being generated to pay for another salesman. Class A business was down 9% by late February of 1980, due to the ineffective dealer program and lack of a dealer coordinator and Class A salesman. Eventually, in late March of 1980, Westerbeke switched its Class B salesman to handle the functions of both the dealer coordinator and the Class A salesman. To make up for the lack of a traveling Class B salesman, then, Westerbeke said that it would put its inside Class B salesman "on the road." This salesman, however, stayed in the office, resulting in a Class B salesman vacancy. Some of Westerbeke's reluctance to hire new personnel was due to the scheduling of its allocation of "J" series products. These shipments were scheduled originally for November and December of 1980, but obviously were needed when the marine season began in April and May. In late 1979 and early 1980, Onan personnel took pains to reschedule these shipments to enable Westerbeke to realize profits that could then be used to hire the needed dealer coordinator and salesman.

In late 1979, a series of discussions took place between Westerbeke and Onan, including meetings in Minneapolis and Northvale, New Jersey. At the Minneapolis meeting, Westerbeke was given the October 8, 1979 Hafner letter. Hafner was Director of Field Sales at that time. Letters of a similar nature were sent to other distributors from time to time. This particular letter warned that the distributorship was not doing well and that Onan would not be able to continue the distributor relationship unless Westerbeke furnished certain reports and achieved a specified average monthly order entry rate as required in the letter.[3] Although an Onan file memorandum dated May 1, 1980 spoke of "nominal compliance" with these requirements, Westerbeke did not in fact meet these requirements. The required monthly dealer reports and quarterly financial statements were submitted late or not at all. Further, after adjusting for returns and cancellations, Westerbeke did not achieve the specified average monthly order entry rate.

By February of 1980, Onan was forced to reduce Westerbeke's line of credit from $250,000 to $150,000 because of Westerbeke's inability to pay its current bills and Onan's review of Westerbeke financial statements for the period ending October 31, 1979. This reduced line of credit was insufficient to support the 1980 shipment goals and, consequently, would result in continual disruptions in the business dealings between Onan, Westerbeke, and Westerbeke's final customers. In an effort to avert this potential problem, Onan requested that Westerbeke's bank issue an irrevocable Standby Letter of Credit for $100,000. The terms and conditions of this proposed letter of credit were to be the same

---

**3.** The three requirements specified in the Hafner letter were:

(1) Submit quarterly Onan financial statements for the quarter ending January 31, 1980, and the following three quarters (Table II). This will allow a divisionalization of the Onan and Westerbeke lines.

(2) Submit monthly summary of Onan Dealer Sales for the month ending October 31, 1979, and the following five months.

(3) Achieve an average monthly order entry rate of $145,000/month for the next six months. Note that this rate is a compromise of Onan's shipment forecasts and is equal to your 79/80 forecast.

as the letter of credit Westerbeke's bank issued August 4, 1978, which had expired. Westerbeke refused such a letter of credit, however, because it thought the marine propulsion market was suffering a set-back and it did not want to tie up collateral. As a result of this exchange, Westerbeke did not have adequate financing to pay for its Onan orders which, in turn, resulted in late charges assessed against it. Also as a result, Westerbeke's already inadequate inventory situation worsened.

By April of 1980, Onan's continuing analysis of Westerbeke's performance indicated that Westerbeke was doing a very marginal job of representing Onan in the Boston marketplace. Westerbeke also was experiencing difficulty in paying Onan. Onan's Field Sales Department monitored Westerbeke closely, anticipating that it would not continue with Westerbeke beyond the end of 1980. A file memorandum dated May 1, 1980 stated that Westerbeke had been a continuous problem in terms of marketing effort and financial performance for some time, the problems addressed in the fall of 1979 generally having been a carry-over of previous discussions at regional meetings, distributor improvement meetings, and individual meetings with Westerbeke's management. In particular, approximately $260,000 of shipments were on credit hold because of past due items. Onan noted that Westerbeke's declining marine assembly business strained its already limited financial resources, presumably affecting its ability to meet obligations to Onan. In addition, complaints from Westerbeke's dealers and manufacturing customers regarding lack of sales calls and poor response from the service department had been increasing. Nor had Westerbeke adopted a formal dealer program or replaced the dealer coordinator fired in December of 1979.

The various alternatives considered by Onan at this time included terminating Westerbeke's distributorship effective July 10, 1980, or continuing with Westerbeke until year end, with a final review of performance and condition at that time. Onan's file memorandum noted that a financial turnaround seemed unlikely given the then current economic conditions, and further noted that an improved marketing effort required financial resources. This memorandum concluded: "Given the depth of Westerbeke's problems, Onan's interests would be better served by a new distributor in the Boston area. Onan's exposure could be minimized if a payment promised by Westerbeke ($133,000) is received. The timing and procedure of the termination should be carried out with this exposure in mind." On May 12, however, Onan received a partial payment of $30,000 and decided to continue with Westerbeke for the time being. Onan continued, however, to consider possible courses of action for the short-term should Westerbeke be terminated since, in the absence of adequate financing including a letter of credit, termination seemed likely. Among the alternatives considered was a short-term "company store" to take over Westerbeke's Onan responsibilities until a new distributor could be found.

Throughout this period, Onan was aware of Westerbeke's competition with Onan products and was concerned with Westerbeke's concommitant de-emphasis of the Onan product line. Referring to mentions in the press of Westerbeke's custom generator and marine work, Westerbeke wrote Onan on April 11, 1979 and assured Onan that these articles showed that increased distributor capabilities "complement" the Onan distributorship. Westerbeke assured Onan that Westerbeke's efforts merely supplemented the Onan product line: "I believe I am correct when I say that some Onan product is included in every one of these generator set products. Yet none of the latter qualify as a 'systems' product, as currently defined, and none of them can be supplied by Onan in any 'off the shelf' sense." Westerbeke concluded this letter by indicating to Onan that such competition would not be great in the future: "Unfortunately the cost of producing, warranting and servicing 'one-offs' is quite high. We have serious questions whether such activity can be profitable."

In October of 1979, Onan received inquiries from its Singapore distributor regarding Westerbeke competition in the area and the Westerbeke President's alleged advice to Japanese users that "it would be a bad choice to go Onan's 30MDEH because the engine has been discontinued." At Onan's Minneapolis headquarters, the Director of Product Management noted to Hafner that: "These activities are beginning significantly to impact emotionally if not financially our own distributor there.... It does appear to me at first glance that not only do they distribute Onan products but they also do it in competition with their own—not entirely a happy marriage for us." At the same time that Westerbeke's activities abroad were distressing Onan's distributor there, Westerbeke's Onan sales performance increasingly was a subject of concern to Onan, as evidenced by the Hafner letter.

Sometime in 1979, Westerbeke began its ultimately successful new line of Westerbeke brand diesel marine propulsion engines and gensets using Mitsubishi engines imported from Japan. In the fall of 1979, Westerbeke asked G.A. Schlachter and Jerry Grabowski, Onan's contractmen regarding engineering, for price quotations and other information about Onan generators for the purpose of "marrying" such generators to a particular engine. It is unclear whether Westerbeke specified a "Mitsubishi" engine. At that time, Grabowski apparently asked Westerbeke why it was assembling small gensets of its own instead of using Onan's product. Westerbeke responded that it wanted "these to sandwich in between the Onan models." Once again, Westerbeke represented to Onan that its assembled products would complement and supplement, not compete with, the Onan product line. The requested price quotations were eventually supplied by Onan, but Westerbeke chose to purchase elsewhere, feeling that the Onan generators were too expensive.

Despite its concerns, Onan continued its efforts to get Westerbeke to improve its performance. In July of 1980, Onan's Director of Power Products, Jerry Best, visited Westerbeke (during Best's vacation).

There he was assured by Westerbeke's President, J.H. Westerbeke, Jr., that Westerbeke could not improve its performance of Onan sales without an increased credit line. Westerbeke had an open line of credit of $150,000 with Onan, and in the past another $100,000 in the form of a letter of credit had supplied Westerbeke with enough credit to support its Onan orders. That letter of credit had expired, however, and had not been renewed because Westerbeke did not want to tie up collateral. Westerbeke's Vice President of Finance told Onan that it was ordering approximately $180,000 worth of Onan products per month and, as a result, was constantly on credit hold. In an effort to assist Westerbeke with its Onan sales, Onan increased Westerbeke's credit line to $250,000. As a result, Westerbeke was able to increase immediately its inventory level. Despite improvement in Westerbeke's account, Onan repeatedly had to remind Westerbeke of penalty notices and unpaid items long overdue, and had to admonish Westerbeke not to take cash discounts after the thirty day discount period expired and not to take unauthorized deductions.

Best was accompanied by Onan Zone Manager, Jeff Servis, on his July, 1980 visit to Westerbeke. Best and Servis noted that Westerbeke obviously had invested a great deal of capital in its Westerbeke marine assembly line. They noted expensive new tools, a large inventory of components, etc. Westerbeke's President made several comments regarding his marine engine business: too many people were getting into the business with lower priced Japanese engines; the Japanese engines cost one-half to two-third the price of English manufactured engines; Kubota, which is marinized by Universal, and the Yanmar engines were giving him stiff competition; and the Onan "L" series engine would be too expensive compared to these Japanese imports. It was not clear whether, at that time, Best and Servis realized that Westerbeke had already entered into an agreement to purchase Mitsubishi components. It is clear that Westerbeke did not inform

Best of his agreement with Mitsubishi. In any event, it would not have mattered to Best. Best knew that Westerbeke had been importing other engines for its marine gensets and there is no reason to believe that Best would have viewed Mitsubishi as other than just another supplier. Nor is there reason to believe that Onan was concerned about the limited marine application. In the three years 1978–1980, 83% of Onan's volume with Westerbeke was in non-marine sales.

Best and Servis did note, however, that the Onan service operation site appeared small and cluttered in comparison to the Westerbeke assembly facility. They also discovered that at that time the Onan Class B salesman and the Onan marine salesman were ill and unable to work, leaving the Onan line covered only by one man handling inside sales and another handling all outside sales.

Unknown to Onan at this time, the increased line of credit to $250,000 played a major role in Westerbeke's financing arrangements with Mitsubishi, with whom it had entered into an agreement in May of 1980. This increased line of credit allowed Westerbeke to increase its inventory level. This increased inventory, sold on credit to Westerbeke by Onan, provided the necessary additional collateral that enabled the Shawmut Bank to loan Westerbeke increased amounts. This increased ability to borrow was vital to Westerbeke, since it had not been granted *any* credit by Mitsubishi and payment to Mitsubishi was required at the time an order was placed. Payment to Mitsubishi was assured through a letter of credit from the Shawmut Bank which had a security interest in Westerbeke's inventory. In effect, unbeknownst to itself, Onan was helping Westerbeke finance its purchases from Mitsubishi. Mitsubishi was at no risk in dealing with Westerbeke, while Onan risked its repayment on the success of the Westerbeke-Mitsubishi line.

By the end of August, 1980, Onan once again "pulled Westerbeke onto the front burner" in order to determine whether it would need to replace the distributorship. Based on the above considerations, Onan decided that it would not renew Westerbeke's distributorship and so informed Westerbeke on October 16, 1980. The non-renewal came as no surprise to Westerbeke. It was already heavily involved with Mitsubishi, had forewarned its accountants of the anticipated non-renewal, and had even indicated that it was somewhat responsible for the non-renewal. Westerbeke spoke of the non-renewal as a program designed by it and stated the loss of the distributorship would be compensated for by the new Westerbeke product. Subsequently, the parties agreed that: Onan would honor all firm orders placed through December 31, 1980, so long as delivery was requested on or before June 30, 1981; Onan would buy back units and parts according to a specified procedure; Onan would supply separate generators to Westerbeke direct from the factory, under normal original equipment manufacturer volume criteria, pricing policy and credit policies. There is no question that Onan complied with the termination provisions of its distributor agreement with Westerbeke.

Although Westerbeke represented to its bank and accountants, as well as Onan, that it intended to return units to Onan for credit against its outstanding account, Westerbeke never returned any products. Instead, Westerbeke sold both returnable and nonreturnable inventory at distress sale prices. If Westerbeke had returned the inventory, it would have incurred little or no loss; instead, Westerbeke incurred a $26,000 loss. Further, Westerbeke did not apply the proceeds of this sale to its outstanding debt to Onan. Westerbeke wanted cash instead of a credit on its account with Onan. By 1980, Westerbeke's gross revenues were about $7,000,000. Onan sales, parts and service accounted for about 35% of the gross revenues.

In January, 1981, Onan replaced Westerbeke with a new distributor, New England Engine Co. The distributorship agreement with New England Engine contained the same provisions as those in the Westerbeke

agreement, including exactly the same termination provisions.

Finally, as to Westerbeke's claim that Onan set unrealistic and unattainable sales goals, the records show the following. In 1977, Westerbeke ranked 33rd out of 71 Onan distributors in dollar volume. In 1978, it ranked 27th out of 68; 42 out of the 68 distributors exceeded their 1978 goals, including Westerbeke; 17 of the 68 distributors improved over 1977 by a greater percentage than Westerbeke. In 1979, Westerbeke ranked 28th out of 59; 16 of the 59 exceeded their 1979 goals, not including Westerbeke; 34 of the 59 improved over their 1978 volume by a greater percentage than Westerbeke. In 1980, Westerbeke ranked 28th out of 56; 17 exceeded their 1980 goals, not including Westerbeke; 30 improved over their 1979 volume by a greater percentage than Westerbeke.

With these findings as a backdrop, I turn to the specific claims and the conclusions relating to each claim.[4]

## CONCLUSIONS OF LAW

At the outset, and to put this matter into perspective, this is not a dealer termination case. The challenged activity here is Onan's decision not to renew Westerbeke as its distributor. Though the pleadings were initially wide-ranging and diffuse, the case boils down to a simple, straightforward inquiry: Why did Onan decide not to renew Westerbeke as its distributor? Was the decision based on legitimate, practical, business reasons? Or, was the decision based on an intent to destroy an emerging competitor?

■ I am mindful that evidence of antitrust violations is often difficult to assemble. Corporate officers would not be likely to leave an incriminating trail of documents and statements if knowingly embarked on an anti-competitive course. At the same time, should they be held to account for an unfortunate choice of words, or the use of

ambitious sales goals, coupled with the liberal use of sales awards to encourage further effort, in defending themselves against antitrust charges? On the other side, the assembly of isolated and selective remarks and documents, skillfully crafted into a Section 2 scenario, must be examined with care. All the evidence must be examined in light of the history of the relationship between the parties, the state of knowledge, and the timing of the statements or documents. Through the use of carefully prepared figures, tables and graphs, an impression of certainty may be created, but, how does it stand up under close examination? Is the offensive conduct of the sort that fosters monopoly power, or is it, at the most, the basis of mere state law claims?

Under ordinary circumstances, Onan would be able to decide not to renew Westerbeke without facing a charge of anti-competitive conduct.

> Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an anti-trust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.

*Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir.1975).

Here, legal issues are raised because Westerbeke charges that Onan failed to renew Westerbeke, not because it was an ineffective distributor, but because Westerbeke was growing into a serious competitor. Onan, whose business made up 35% of Westerbeke's revenues, knew that by taking away that 35%, it could "strangle the baby in its crib" before it could grow into a competitive force.

---

**4.** The foregoing background describes the business relationship between the parties and does not include findings with regard to other factual issues presented in this case, e.g., monopoly

power. To the extent the following discussion incorporates factual material, it should be regarded as a continuation of the findings set forth above.

In order to prevail on its antitrust claims, the plaintiff must show monopoly power and an abuse of that power. Those claims are addressed next.

## THE MONOPOLIZATION OR ATTEMPT TO MONOPOLIZE CLAIM

Westerbeke claims that Onan's conduct constituted actual monopolization or attempt to monopolize in violation of Section 2 of the Sherman Act.[5] To establish its claim of monopolization in violation of Section 2, Westerbeke must establish by a preponderance of the evidence the elements of unlawful monopolization: (1) that Onan had monopoly power; and (2) that Onan engaged in monopolizing conduct. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir.1977); *Gradsky v. Sperry Rand Corp.*, 489 F.2d 502 (6th Cir.1973). To establish its claim in the alternative of attempt to monopolize in violation of Section 2, Westerbeke must establish the elements of unlawful attempt to monopolize: (1) that Onan had specific intent to obtain a monopoly; and (2) that there was a dangerous probability that Onan would succeed. *See American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1945); *Swift Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir.1975); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 554 (1st Cir.1974), *citing United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 398, 76 S.Ct. 994, 1008, 100 L.Ed. 1264 (1956).

Addressing first the charge of unlawful monopolization, I must determine whether Onan had "monopoly power;" that is, the power either to set prices or to exclude competition in the relevant market. *United States v. E.I. du Pont de Nemours & Co., supra; United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Associated Radio Service Co. v. Page Airways, Inc.*, 414 F.Supp. 1088 (N.D.Tex.1976). In order to determine whether Onan had monopoly power, I must examine its market share of the relevant market. *See United States v. E.I. du Pont de Nemours & Co., supra*, 351 U.S. at 391–93, 76 S.Ct. at 1004–1006; *Berkey Photo, Inc. v. Eastman Kodak Co., supra* at 268. There are two aspects to the definition of the relevant market: the relevant geographic market and the relevant product market. *In re IBM Peripheral EDP Devices Antitrust Litigation*, 444 F.Supp. 110 (N.D.Cal.1978). The parties to this action have stipulated that the relevant geographic market is the United States of America. The relevant product market, however, is in dispute. Westerbeke argues that the relevant product market consists of marine diesel gensets in the 0 to 30 kilowatt range. Onan counters that the relevant product market consists of diesel and gasoline gensets of all applications and sizes up to 1000 or 2000 kilowatts.

For purposes of antitrust analysis, the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it, taking into consideration the cross-elasticity of production facilities. *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 n. 42, 82 S.Ct. 1502, 1524 n. 42, 8 L.Ed.2d 510; *United States v. E.I. du Pont de Nemours & Co., supra*, 351 U.S. at 404, 76 S.Ct. at 1012; *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir.1976). With-

---

**5.** Section 2 of the Sherman Act makes unlawful three different types of conduct: (1) actual monopolization; (2) attempt to monopolize; and (3) conspiracy to monopolize. The statute reads in part:

Every person who shall monopolize, or attempt to monopolize, or combine and conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

15 U.S.C. § 2.

in a broad market, however, well-defined submarkets may exist that in themselves constitute product markets for antitrust purposes. *United States v. Grinnell Corp., supra,* 384 U.S. at 572, 86 S.Ct. at 1704; *Heatransfer Corp. v. Volkswagenwerk, A.G., supra,* at 980. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, economic production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors. *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc., supra; see Brown Shoe Co., Inc. v. United States, supra,* 370 U.S. at 325, 82 S.Ct. at 1523.

■ Gensets dedicated to the marine application represent between 4 and 6% of all gensets sold in the United States. Within the broad marine application, both diesel and gasoline gensets for commercial (up to and including workboats) and recreational uses, ranging from 0 to 150 kilowatts, are sold. Westerbeke argues that, within the broad marine application, there is a relevant product submarket consisting of only marine diesel gensets in the 0 to 30 kilowatt range, adapted for pleasure boat use. In support of this assertion, Westerbeke argues that the pleasure boat segment of the genset market has its own identifiable customers, distinct pricing patterns, and requires nationwide distributor networks and dockside service facilities. I am mindful, however, of the admonition that a market definition which is confined to the seller's perspective is not meaningful. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra,* at 551, *citing United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 592 (S.D.N.Y.1958). This admonition is particularly pertinent here, because the plaintiff's expert witness did not conduct any investigation but, instead, merely accepted Westerbeke's definition of the relevant product market without question.[6]

Determining the relevant product market in this case was not a simple, straightforward task. The plaintiff proposed a very narrow submarket consisting of a mere portion of the marine application, which itself is but one application among many in the broader genset market. By comparison, the defendant proposed the broad range of gasoline and diesel gensets of all applications as the relevant product market. Both parties presented testimony in support of their proposed market definition. This Court bases its finding of the relevant product market on the testimony and exhibits presented at trial. In general, I found the relevant product market definition presented by the defendant's case team of experts, who investigated the technical aspects of the products involved, the pertinent market strategies, etc., to be the better-supported, with more credible evidence.

Turning to the various determinants of product market, I examined first the cross-elasticity of production facilities. It is clear that gensets of all sizes, intended for the full variety of applications, are produced in common facilities. As stated earlier, gensets are assembled by joining a generator/alternator to an engine in order to produce electricity. Only in the latest stages prior to marketing are gensets modified for particular applications. The variety of applications for electric gensets includes construction, industry, farm, home, recreational vehicle, business, standby, cogeneration, public works and oil fields, in addition to marine. Credible expert testimony indicated that the modifications needed to adapt gensets to the marine application are neither complicated, time-consuming, nor unique, and could be performed easily by any reasonably competent mechanic.

■ Further, credible expert testimony indicated that, should increased demand or

6. Other inadequacies and inaccuracies, both major and minor, in the presentation of the plaintiff's expert were brought to the Court's attention by a defendant's expert, a partner in the accounting firm of Peat, Marwick & Mitchell. This expert took issue with the plaintiff's expert's projection methods and assumptions.

potential profits invite greater production of 0 to 30 kilowatt gensets, existing capacity could be shifted to such production without significant new investment in plant, equipment and worker training.[7] *See* Scherer, *Industrial Market Structure and Economic Performance*, 61 (2d ed. 1980). Products that are produced in common facilities should be included in the same market where the facilities are freely convertible from one product to the other. 2 P. Areeda & D. Turner, *Antitrust Law*, 352 (1978); *see* R. Nelson, *Concentration in the Manufacturing Industries of the United States*, 25 n. 16 (1963) ("If a change from producing one product to another in these establishments is quickly and economically accomplished, this defines a high cross-elasticity in the supply of the several products, and on that definition the products may be said to belong in the same market."). This is true regardless of whether or not it is likely that such increased production ever would be warranted. So long as the potential to shift production exists, the products produced in a common facility should be included in the same market.

Further support for this finding that the relevant product market should include diesel and gasoline gensets of all applications and sizes is found in the consistent testimony of all parties that Onan was very vulnerable to new product introduction, as witnessed by its immediate loss of sales to Westerbeke when Westerbeke introduced its new line using the Mitsubishi engines. Onan's dominance in the marine application was the result primarily of its successful "J" series engine which was designed in the early 1960's and remained relatively unchallenged and, therefore, unchanged through the 1970's. Onan's dominance through the "J" series engines came to an abrupt end, however, when gensets using Japanese engines were introduced in the late 1970's. These engines were more compact, substantially quieter, lighter, and rep-

resented a major improvement over the "J" series engine. They quickly dominated the market. Westerbeke's ability to increase its share of sales in the marine pleasure boat application from 2 to 50–70% in less than three years is most persuasive evidence that the proposed submarket is not relevant for purposes of antitrust analysis.

■ Onan could not unilaterally raise its prices to exclude competition in the marine application, particularly not in the proposed submarket of only diesel gensets in the 0 to 30 kilowatt range adapted for pleasure boat use. Credible expert testimony at trial indicated that, in the marine application, Onan could not raise prices of its product without triggering significant new entry into the application. Nor could Onan raise barriers to entry, control limited resources, or otherwise exclude competition. Contrary to Westerbeke's claim, Onan did not have "historical control over the only inexpensive source of small engine supply." Onan's dominance resulted from the "J" series engine which remained unchanged for many years, allowing Onan to recover the research and development costs and to produce at a low price. Onan did not, however, control a limited *resource* that prevented others from producing competing engines. *Compare United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945). In fact, Westerbeke itself tried to design and develop the "Star" engine, in addition to purchasing English engines. Its lack of success with the "Star" project was not due to any "control" exercised by Onan. Onan could not raise the barriers to entry by raising research and development costs. Thus, any dominance that Onan possessed in this proposed submarket would be meaningless for purposes of finding antitrust violations, for Onan lacked monopoly power.

■ The sale of 0 to 30 kilowatt diesel gensets dedicated to marine pleasure

---

**7.** There was testimony from the plaintiff's president that shifting production to manufacture gensets adaptable to the marine application would require tens of millions of dollars and

five to ten years. These bald, unsupported statements were not credible in light of all the evidence.

boat use is not a relevant submarket for the purpose of antitrust analysis; rather, it is merely a portion of the marine application, which itself is but one application among many in the market for diesel and gasoline gensets. Essentially, the plaintiff has carved out of the broad range of diesel and gasoline gensets a narrow proposed submarket that, facially, shows Onan with a high percentage of sales suggesting monopoly power. I do not believe he can do so. For example, if the plaintiff's methods are accepted, a manufacturer of light bulbs could claim a relevant product submarket within the broader market of "all light bulbs sold" consisting only of "all light bulbs under 25 watts adapted by the manufacturer for low wattage use." Such a proposed submarket may show a defendant with a facially impressive market share, but it does not withstand product market analysis.

In accord with the above, I find that the relevant product market in this action consists of diesel and gasoline gensets of all applications and sizes up to 2000 kilowatts. Within the relevant product market in the United States, Onan did not possess monopoly power. Its share of this market was less than 20%, and no evidence was presented whereby this Court could conclude that Onan had power to control prices or exclude competition in this market. *Compare United States v. Grinnell Corp., supra* 384 U.S. at 567, 86 S.Ct. at 1702; *American Tobacco Co. v. United States, supra* (80% of market constituted monopoly power); *Heatransfer v. Volkswagenwerk, A.G., supra* at 981 (market share between 71% and 76%); *United States v. Alcoa,* 148 F.2d 416, 424 (2d Cir.1945). I therefore conclude that Westerbeke has failed to establish the first element of the offense of unlawful monopolization, that Onan had monopoly power in the relevant market.

Although I believe the market definition above to be determined correctly, I am aware that conflicting evidence appears on the record. Therefore, it is important to consider further whether Westerbeke also failed to establish the second element of the offense of unlawful monopolization, that Onan engaged in monopolizing conduct. Westerbeke's failure to establish the second element, alone, would be sufficient to find that Onan did not engage in monopolization in violation of Section 2.

Monopolizing conduct is defined as intentional activity that tends to exclude competitors and is not necessarily required for socially approved competition on the merits. *See United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 343 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* at 275. Such conduct need not be illegal, but must tend to exclude competitors or limit the opportunity of competitors to compete on the merits with the defendant. *Id.* Section 2 is not violated, however, where the defendant gained the monopoly solely through exercise of "skill, foresight and industry." *United States v. Alcoa, supra,* at 430. Skill, foresight and industry have been equated to conduct necessary for competition on the merits. *See American Tobacco Co. v. United States, supra; United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Such conduct includes fair price competition, development of patents, improvements of product quality, etc. *See United States v. United Shoe Machinery Corp., supra,* at 342. Conduct unnecessary for the competitive process, by comparison, includes merging to monopoly, long term exlusive supply contracts, exploitation of purchasing leverage, predatory pricing, etc. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *United States v. Alcoa, supra; United States v. Griffith, supra; see United States v. United Shoe Machinery Corp., supra; Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

A specific intent to monopolize need not be shown to establish the offense

of monopolization where the monopolist undertakes anticompetitive actions. *United States v. Griffith, supra,* 334 U.S. at 105, 108, 68 S.Ct. at 944, 946. There are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under Section 2 if done by a monopolist. *See United States v. United Shoe Machinery Corp., supra,* at 343. The anticompetitive quality of an act may depend, however, upon the purpose with which it was done. *E.g., Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684 (1927).

Westerbeke claims that Onan refused to renew the distributorship with the knowledge that Westerbeke was dependent upon the revenues generated by the Onan distributorship to support its efforts to compete with Onan in the sale of marine diesel gensets. Westerbeke claims that the deprivation of these continued revenues impaired its efforts to compete. Onan counters that its decision not to renew was motivated solely by sound business reasons.

■ Onan gained its dominance in the marine application, as discussed above, through exercise of skill, foresight and industry. It developed a successful "J" series engine and marketed it through its preexisting distributorship system. Onan did not secure its dominance through anticompetitive conduct, such as predatory pricing, long term exclusive supply contracts, etc. The only conduct of which Onan was guilty was refusing to renew a distributorship agreement with a distributor who was devoting increasing attention to its own products at the expense of the distributorship. In addition, Onan was relieving itself of its position as an unknowing, unwilling financer of Westerbeke's other projects. This conduct, however, can not be considered monopolizing conduct. Onan's relieving itself of a further relationship with such a distributor was necessary for socially approved competition on the merits vis a vis other generator manufacturers.

*Telex Corp. v. IBM,* 510 F.2d 894 (10th Cir.1975) provides support for this conclusion. Telex manufactured peripheral equipment for use with IBM computers. As a result of Telex's inroads into its sales, IBM responded by cutting its prices on certain units. In addition, IBM adopted the practice of its rivals in offering customers discounts for long-term leases on the equipment it rented out. In reversing the lower court, the circuit court stated that the proper inquiry was not a narrow one of whether the monopolist's act was "a consequence of historic accident, business acumen, or a superior product;" rather, the two important questions were: (1) whether or not the acts are ordinary business practices typical of those used in a competitive market, and (2) whether the acts constitute *use* of monopoly power. The circuit court found that the acts of IBM were not derived from its power in the market or its size, nor were they acts which could only have been performed by one with the requisite power. The acts found by the trial court to be illegal were ordinary market methods available to all in the market. IBM did not *use* monopoly power even if it were assumed that it possessed such power.

Onan's decision not to renew the distributorship of an ineffective distributor was not a *use* of its dominance and power in the marine application. In addition, it certainly would be an ordinary business practice typical of those used in a competitive market to refuse to renew an ineffective dealer. To say that a defendant with monopoly power can not refuse to saddle itself with an ineffective distributor for another three years, and that it must supply that ineffective distributor with the wherewithal to compete, does not promote competition or comport with the policies of antitrust law. The goals of competition—better products and lower prices—would be thwarted if Onan could not make sound business decisions for itself, simply because of its dominance in a particular market. The circuit

court in *Telex* rejected such an illogical limitation on the defendant's conduct, stating that such a limitation would permit the defendant to do nothing to meet competition. That decision, applied to this case, allows Onan to decide not to renew an ineffective distributor for business reasons, despite the impact of such nonrenewal on the distributor's financial ability to compete with the manufacturer. Such a non-renewal is not a *use* of monopoly power.

■ Even a manufacturer's refusal to deal with a distributor or dealer does not violate the antitrust laws merely because it adversely affects the entity refused. In fact, such effects are immaterial when the refusal is for business reasons which are sufficient to the manufacturer. *Marquis v. Chrysler Corp.*, 577 F.2d 624, 640 (9th Cir.1978), *citing Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir.1972). In the present case, however, there has been no refusal to deal. Although Onan has refused to enter into a new distributorship agreement for business reasons, Onan still is willing to sell its products to Westerbeke on terms given to other buyers. *Compare United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; *Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir.1980).

For the reasons stated above, even if this Court had found Onan to possess monopoly power in the proposed submarket, Onan did not engage in monopolizing conduct. Having found that the plaintiff has failed to establish either element of the offense of monopolization, this Court finds that Onan did not monopolize in violation of Section 2 of the Sherman Act.

■ Addressing next the charge of unlawful attempt to monopolize, I must determine whether Onan had specific intent to obtain a monopoly in the relevant market, which consists of diesel and gasoline gensets of all applications and sizes up to 2000 kilowatts. While the offense of actual monopolization demands only a general intent to do the act, a specific intent to destroy competition or build monopoly is essential to guilt for the offense of mere attempt. *Times-Picayune v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953), *citations omitted.* Specific intent to obtain a monopoly is an intent to control prices or to unreasonably restrict competition. *United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1976).

■ Westerbeke claims that Onan refused to renew the distributorship agreement, intending to deal a financial blow to Westerbeke which would eliminate the threat of competition from the Westerbeke-Mitsubishi marine diesel gensets between 0 to 30 kilowatts. This Court has found, however, that Onan's decision not to renew the distributorship agreement was "predominantly motivated by legitimate business aims." *Times-Picayune v. United States, supra*, 345 U.S. at 627, 73 S.Ct. at 890. Onan believed Westerbeke to be an ineffective distributor whose increasing attention to Westerbeke's own line of marine diesel pleasure boat gensets was impairing Onan's posture vis a vis the other major gasoline and diesel genset manufacturers. Onan's refusal to renew Westerbeke's distributorship cannot bear out the specific intent essential to sustain an attempt to monopolize under Section 2. *Times-Picayune v. United States, supra*, at 627, 73 S.Ct. at 890; *compare Walker Process Equipment v. Food Machinery and Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Union Leader Corp. v. Newspapers of New England*, 180 F.Supp. 125 (D.Mass.1959), *aff'd in part and rev'd in part*, 284 F.2d 582 (1st Cir.1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). Since Westerbeke has failed to establish the first element of the offense of attempt to monopolize, that Onan had specific intent to obtain a monopoly in the relevant market, I find that Onan did not engage in an attempt to monopolize in violation of Section 2 of the Sherman Act.

■ Completing the analysis, however, I would further note that the plaintiff also

failed to establish the second element of the offense of attempt to monopolize, that there was a dangerous probability that Onan would succeed. Within the relevant market consisting of diesel and gasoline gensets, Onan had only a 20% market share. *See Walker Process Equipment v. Food Machinery and Chemical Corp., supra* (no "natural monopoly" market involved; defendant's power in relevant market must be defined before finding of dangerous probability can be made). I cannot find that Onan's decision not to renew the distributorship agreement improved its chances of obtaining a monopoly in the relevant market to the point that there was a dangerous probability that Onan would achieve a monopoly. Even if we assume that Onan had specific intent to destroy any competition by Westerbeke, and non-renewal resulted in the elimination of such competition, Onan's market share still would not have been improved to the point that there would be a dangerous probability that it would achieve a monopoly.

In conclusion, the plaintiff has not met its burden of establishing by a preponderance of the evidence the elements of either monopolization or attempt to monopolize under Section 2 of the Sherman Act.

## THE BREACH OF CONTRACT CLAIM

 Westerbeke claims that the October 8, 1979 Hafner letter constituted a contract to renew the distributorship agreement, provided that Westerbeke met certain requirements. Westerbeke contends that it gave valuable consideration in meeting those requirements and, therefore, Onan's promise to renew is enforceable. Onan denies that the parties ever had an agreement, written or oral, to renew the distributorship. Further, Onan states that the Hafner letter merely memorialized requirements that Westerbeke was already bound to meet under the then-effective agreement, and Westerbeke failed to meet the requirements specified in the letter in any event.

As stated earlier, I have found that Westerbeke did not comply with the re-

quirements of the Hafner letter and, therefore, non-performance is dispositive of this claim even if the Hafner letter was an offer.

However, I further conclude that the Hafner letter does not constitute an offer to renew the distributorship agreement, but merely sets forth three requirements that, if not satisfied, would preclude Onan from even considering an offer to renew. The pertinent portion of the letter reads: "If positive results are not indicated by May 1, 1980, on points 1, 2 and 3 above, Onan will not be able to continue its present distributorship relationship with J.H. Westerbeke Corporation." This is not equivalent to an offer to renew subject to conditions precedent. Hafner did *not* write: "If positive results are indicated on points 1, 2 and 3 above, Onan *will* continue its present distributor relationship with Westerbeke." Nor is the letter an expression of intent to renew; rather it simply informs Westerbeke that Onan would not "be able to" continue the relationship if positive results were not indicated as specified in the letter. Read most liberally in favor of Westerbeke, the Hafner letter informs Westerbeke that, if positive results were indicated, Onan would "be able to" continue the relationship; again, this does not constitute an actual offer to renew.

The plaintiff relies on J.H. Westerbeke, Jr.'s own October 26, 1979 rebuttal letter in response as evidence that Onan made an offer to renew, provided that certain requirements were met. Westerbeke relies on one line of the multi-page rebuttal: "In a limited sense we are pleased that you will continue our distributorship relationship if we achieve this order entry rate and provide certain quarterly Onan financial statements and monthly Onan dealer sales summaries as requested in your October 8, 1979 letter." Westerbeke's subsequent characterization at trial of this response as an "acceptance" of an alleged offer, however, does not supply the necessary mutual assent that is clearly missing. Restatement of Contracts Second § 17 (1979). The Hafner letter did not constitute an offer to

renew and J.H. Westerbeke, Jr.'s "acceptance" cannot create an offer where none was made. At no time was there a "meeting of the minds" that the distributorship agreement would be renewed.

Furthermore, in response to Westerbeke's letter of October 26, 1979, Hafner responded that Onan's position remained unchanged. "That is 'the Westerbeke Corporation has not effectively developed and implemented programs to take advantage of whatever Onan business is available.'" As late as September 23, 1980, Westerbeke was seeking confirmation from Best of Onan that the distributorship was going to be renewed since Westerbeke's only full time road man at that time had just suffered a serious heart attack and had to be replaced. Also, Westerbeke never indicated to either its bank or its accountants that it believed it had a contract to renew with Onan, a failure at total odds with its at trial assertion that it believed it had a contract to renew. Finally, there was no evidence that Hafner was an officer with authority to bind Onan. Earlier agreements were made by Wakefield, Vice President of Domestic Marketing.

For the above stated reasons, this Court finds that the plaintiff has not established the existence of a contract to renew and, accordingly, the breach of contract claim fails.

### THE MASSACHUSETTS GENERAL LAWS, CHAPTER 93A CLAIM

■ Based on my factual findings and the above rulings on the antitrust and breach of contract claims, I find that the plaintiff has failed to show that Onan engaged in any unfair or deceptive act or practice. Accordingly, the plaintiff's c. 93A claims fails.

### ONAN'S COUNTERCLAIM FOR LATE PAYMENT AND INTEREST CHARGES

In Count I of its counterclaim, Onan seeks $204,021.75 for goods sold and delivered to Westerbeke. Westerbeke has sti-

pulated that it purchased such goods and owes Onan that sum.

■ In Count II, Onan seeks late payment and interest charges based on the $204,021.75 that Westerbeke admittedly owes for goods sold and delivered. Westerbeke contends that the distributorship agreement did not provide for a late payment charge. Article 7 of the agreement, however, provides that the prices for products sold to distributors "shall be in accordance with Onan's pricing and discount policies in effect at the time of acceptance of the order, which may be amended from time to time." At the time Onan accepted each of the orders reflected in the Westerbeke account, the applicable Onan Credit Booklet dated March 7, 1979 provided for a penalty of one percent per month to be assessed against any delinquent items. Westerbeke has not disputed this penalty policy set forth in the Onan Credit Booklet.

I find that the distributorship agreement incorporated by reference the one percent per month simple interest penalty of the applicable Onan Credit Booklet. This interest rate is equal to the statutory rate of 12% per annum. M.G.L. c. 231, § 6C. Accordingly, I award late payment and interest charges of $23,910.78 for the period ending October 31, 1981 (based on Onan penalty notices sent to Westerbeke), and award interest at the rate of 12% per annum thereafter.

### MISCELLANEOUS FINDINGS

A great deal of testimony and numerous exhibits were taken in the course of this trial. Each party fully explicated and documented its interpretation of the course of events in dispute. On its face, the written record of this matter could support either interpretation. In making my findings and conclusions, however, I was persuaded by the greater credibility of the defendant's case. The witnesses were candid and fair, and the experts, engineering, marketing and economic analysts, presented a clear, soundly based and documented exposition of the defendant's position.

The sole witness from Westerbeke was J.H. Westerbeke, Jr., the corporation president. No other Westerbeke employee testified, not even by deposition. This witness testified most emphatically and authoritatively as to the course of dealings between the parties and Onan's motives in deciding not to renew the distributorship agreement. Generally, I found his testimony to be uncorroborated and self-serving. There was no support for his far-reaching statements on virtually every aspect of the case. The only witness Westerbeke offered to testify directly to anti-competitive conduct was a former Onan employee who left Onan in 1976. The former employee testified to two remarks by Onan employees, one made in 1973 and the other in 1979, that Onan wanted to get rid of Westerbeke because it was competing with Onan.

My apprehension of the unreliability of J.H. Westerbeke's testimony was supported by documentary evidence of disinterested third parties, specifically, Kenneth J. Menard of the Shawmut Bank and Alan R. Goldstein of Touche Ross & Co. In particular, Westerbeke informed both its bank and its accountants that the loss of the Onan distributorship would not seriously affect its financial stability. Westerbeke, knowing that both the bank and the accountants relied on this information in assessing Westerbeke's prospects, told both that the lost volume would be made up by sales of its new Westerbeke line. Westerbeke informed both that it would return units and parts inventory to Onan, thereby improving its financial situation. Westerbeke, however, never did so and never so informed the bank or the accountants. At this time, a Touche Ross & Co. auditor noted $181,000 of Onan inventory on hand, and commented that a net realizable markdown need not be considered because of the buy back arrangement with Onan. Interestingly, this auditor also noted that Westerbeke's inventory was substantially comprised of raw materials to assemble its products, including *$478,000* of Japanese blocks and transmissions which were purchased in the second part of fiscal year 1980. Touche Ross & Co.'s

understanding of the situation is illustrated by portions of a memorandum to the file dated February 9, 1981: "We discussed the ONAN situation whereby ONAN cancelled their distributorship with basically *their* [Westerbeke's] concurrence effective December 31, 1980.... We discussed the possibility of disclosure of this fact in the financial statements but agreed that *since this had been a designed program on their* [Westerbeke's] *part* and *that all of the ONAN work would be replaced* by their own internally manufactured generator, which they are now marketing, that disclosure would not be that necessary. All the parts are being sold off at a profit either to other distributors or will be taken back by ONAN (emphasis added)."

Most significantly, by March 3, 1982 the Touche Ross & Co. partner in charge of the Westerbeke account determined that Touche Ross & Co. should refrain from further dealing with Westerbeke because they had "basically lost all respect for the client." Touche Ross & Co. could not rely on Westerbeke's valuation of its inventory and it felt that its auditors had been "lied to, drawn around in circles, mislead, and just about any other type of experience you might want to describe." This "integrity" memorandum casts further doubt on the credibility of the plaintiff's representations at trial.

While Westerbeke made representations to its bank and its accountants that the loss of the Onan distributorship would not seriously impact on its financial situation, Westerbeke expects this Court to believe that the non-renewal resulted in near bankruptcy, that it was all that Westerbeke could do at the time to survive, that Westerbeke could not pay any of its creditors and was forced to sell Onan inventory for cash without repaying Onan. While I am inclined to believe that Westerbeke feared for its survival after non-renewal, a belief which underlay my c. 93A decision, Westerbeke's highly contradictory representations to its bank and its accountants gives me significant pause.

Finally, I could not help but note the dearth of independent corroboration of Westerbeke's evidence as to the relevant product market and Onan's anti-competitive activity. There was no testimony from other members of the industry or alleged market, nor did any marine dealer, boat builder or repairman testify. There was no independent evidence of the customer or public view of the relevant market, nor were specific prices discussed.

## SUMMARY

Judgment is entered for the defendant on the claims based on Section 2 of the Sherman Act. Judgment is entered for the defendant on the breach of contract claim and the M.G.L. c. 93A claim. Judgment is entered for the plaintiff-in-counterclaim on the counterclaim for payment of $204,021.75 with late penalty and interest charges of $23,910.78 for the period ending October 31, 1981, and interest at the rate of 12% per annum thereafter.